In re COFFIN.

(District Court, D. Connecticut. May 10, 1906.)

No. 1,179.

BANKRUPTCY—PROPERTY PASSING TO TRUSTEE—ESTOPPEL TO ASSERT EQUITABLE TITLE.

A bankrupt had been a stockholder in a corporation which owned western lands, and with the other stockholders had advanced money to the corporation to pay its debts, to secure which a mortgage was taken on its lands. The mortgage was foreclosed by the trustee therein, who bought in the lands as such trustee. Subsequently, at request of the stockholders, he conveyed the lands without consideration to the bankrupt individually, and the latter, in order to settle any question as to

his title and to facilitate sales, instituted a suit in equity, to which the stockholders became voluntary parties, in which it was decreed that he was the absolute owner of the lands in fee simple, the title was quieted in him, his heirs and grantees, and all the defendants were enjoined from questioning the same. From time to time thereafter he sold portions of the lands, and mingled the proceeds with his other funds, but kept an account of the same, and when sufficient accumulated distributed the amounts so received among the stockholders of the corporation. At the time of his adjudication as a bankrupt he still held certain of the lands, and also had in his possession proceeds of others sold, which he had put into the form of a draft payable to him as trustee. *Held*, that the stockholders of the corporation were estopped by the decree to which they had consented from asserting any equity or trust, which would prevent the property from passing to the bankrupt's trustee, under Bankr. Act July 1, 1898, c. 541, § 70 (5), 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451], as property which he could have transferred, and which might have been levied upon and sold under judicial process against him.

In Bankruptcy. On petition for review of order of referee.

Clarence E. Bacon and John M. Ragan, for petitioner.
Hobart Hotchkiss and William H. Ely, for trustee.
Howard Taylor, for Russell Murray & Co., intervening creditors.

PLATT, District Judge. A careful study of the situation which this case has taken during its later presentations to the referee discloses no sound reason for passing upon the main contention, which is separated into diametrically opposing views—one taken by the claimants and the other by the trustee. The referee, however, perhaps wisely, and certainly courageously, assumed the burden, the matter has been fully and fairly discussed before him and before the court, and there is no disposition to avoid an expression of opinion, which may shed some light upon what may happen when the chance for final solution arrives.

The essential facts can be briefly stated: In 1890 there existed in Nebraska a corporation known as the Nebraska Real Estate & Live Stock Association, which had many stockholders, widely scattered about the country, among whom appears the bankrupt, for himself and for his wife. Becoming embarrassed, it requested a loan from the stockholders, so that it might pay its debts. It agreed to repay the loan, with 8 per cent. interest, and to mortgage its property therefor. Each stockholder loaned the pro rata amount called for under his holding, and to secure them a mortgage was made to one A. L. Clarke as their trustee. In 1899, default having been made under the trust deed, the said Clarke, under the powers therein contained, obtained a foreclosure in the district court of Adams county, Neb., and the property was conveyed to him as trustee for the stockholders, who had made the advances to the corporation, as above described. Clarke went on acting as such trustee until November, 1900, when, at the written request of the stockholders, for whom he was acting, he conveyed the property to the bankrupt. The bankrupt paid no money to Clarke for such conveyance. The bankrupt then had upon the records the absolute title to all the real estate in Nebraska which had formerly belonged to said corporation. Early in 1902, it appearing that, although the legal title to said real estate was in the bankrupt, a pros-

pective purchaser, knowing the situation, feared the possible legal complications which might arise, Mr. Coffin brought suit in the district court for Adams county, Neb., against the corporation and its stockholders, all of whom submitted to the jurisdiction of the court. He had already obtained quitclaim deeds from all the stockholders for the purpose of quieting and confirming his title, without paying any moneys therefor, and these he recited in his petition, and they were made part of the decree, and placed on file in the clerk's office. The decree based on said petition is dated June 2, 1902. It shows full jurisdiction, and sets forth, more fully, perhaps, than I have done, the facts above recited, and, inter alia, contains this:

"* * * That plaintiff is now the absolute owner in fee of all the premises hereinafter described, having full power to sell and convey the same, and to take mortgages for securing any portion of the purchase money in his own name, and to release the same; that all the defendants hereto are forever barred and should be enjoined from ever calling in question plaintiff's right and title to do, or his * * * title to said premises, and the title to his grantees and the grantees of said A. L. Clarke, trustee. That the lands and premises to be affected by this decree are described as follows . * * * *"

After the description comes the decretal order, which is in part as follows:

"It is therefore ordered, adjudged, and decreed that the title to all said premises be forever quieted and confirmed in plaintiff and his heirs, his or their grantees, and the grantees of A. L. Clarke, trustee, free and clear of any outstanding interest, claim, or title; that defendants and all persons claiming or to claim through, by, or under them, or either of them, be and they are hereby forever barred and enjoined from in any manner questioning plaintiff's title to such of said lands as still stand in his name, or the title of his grantees or the grantees of A. L. Clarke, trustee, in lands by him heretofore conveyed."

After the decree the bankrupt disposed of several pieces of the real estate therein described, giving deeds therefor in his own name, and receiving in payment certain sums in cash and certain mortgages back to him personally upon the properties sold. Long prior to that time, and continuously until the adjudication, the bankrupt kept only one bank account, which was in the First National Bank of Middletown, and in his individual name. He mingled therein his own moneys and the moneys of his wife and all receipts from the sales of the Nebraska lands. As returns accumulated from the western property, he paid to the stockholders, who had advanced moneys to the Nebraska corporation, a considerable percentage on their advancements, with interest at 8 per cent., turning over to them, as convenience dictated, the mortgages given to him individually in part payment on the sales, and filling up the balance of each stockholder's share with his personal check. Such payments were accepted by the stockholders, who gave receipts therefor, as payments on account of their advances. In 1899 the corporation voted the bankrupt a salary of $1,500 per annum. The bankrupt credited this salary monthly on the books up to August 1, 1901, and from August 1, 1901, to June 1, 1902, he credited himself with services at the rate of $175 a month. Up to February, 1903, a large sum had accumulated in his personal bank account from sales

of the western lands.   Some time during the year 1903 the bankrupt erased in pencil the credits to himself for salary and services, and made a memorandum of charges for having given warranty deeds to purchasers amounting to $15,300.   He had no claim against the stockholders of said corporation which warranted such a charge.   Between June, 1903, and the adjudication Mr. Coffin loaned from said accumulated funds to the L. D. Brown & Son Company, of which he was president and treasurer, $6,000, taking as collateral security certain silk goods, and received three notes of $2,000 each, dated in June, September, and October, respectively, made payable to him as trustee. Said corporation has a receiver, and by him two of these notes were paid to said Coffin after adjudication, by a New York draft payable to him as trustee.   This draft and the third note have gone into the possession of the trustee in bankruptcy under the referee's orders herein attacked.   On November 14, 1903, Mr. Coffin drew out his entire deposit—about $4,800—added thereto $1,000 which he had in a drawer at the office of the assurance company, and $1,915.86, which had come, like former remittances, in the shape of a personal draft from the western agent, and with such proceeds obtained a New York draft to himself as trustee for $7,715.86, which has also, under said orders, been turned over to the trustee in bankruptcy.   Since June 2, 1902, the bankrupt has done many things which indicate that he understood that he was acting in his management of the western property in the interest and for the benefit of the stockholders who had made the loans as described.   Such a situation existing, Mr. Coffin was adjudicated on his own petition December 2, 1903, and a trustee was chosen by the creditors.   Section 70 of the bankrupt act of July 1, 1898 (chapter 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]), provides what property shall be vested by operation of law in the trustee, and specifies in subdivision 5:

"Property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon or sold under judicial process against him."

The property here in controversy is of two kinds: (1) Western real estate; (2) proceeds of sales of such estate, which have been treated as hereinbefore described.   Strictly construed, the section referred to applies to both.   The petitioner, however, wishes to avoid such construction by invoking the principle that a trustee in bankruptcy does not take as an innocent purchaser, and that the bankrupt's property shall be held by him subject to all valid liens, claims, and equities.   He claims to have established by the facts in this case that a resulting trust existed prior to the adjudication between the bankrupt and the stockholders of the Nebraska corporation.   His petition, after setting forth the facts upon which he relies and the orders of the referee, goes on to say that the beneficiaries, who are the stockholders in the Nebraska corporation, expect him to go on with the execution of his trust, and to distribute what he now has and what he may get, and therefore prays that the orders of the referee may be vacated, and that the trustee in bankruptcy forthwith proceed to

reinvest him with all his rights as a trustee for the stockholders of which said orders devested him.

In the course of the hearing before the court the matter has assumed a new shape. Very little is heard now about Mr. Coffin, and much about the so-called "beneficiaries," and the demand now is, not that the trustee in bankrutpcy shall turn the property over to Mr. Coffin, but, admitting his possession of the property under the referee's orders to be legal, that he shall proceed to convert it into cash, and to distribute it among the stockholders of the Nebraska corporation, in accordance with the alleged trust formerly existing between them and the bankrupt, to the exclusion of the general creditors. No such demand appears upon the record, and if such action were proper, it could only be taken after a complete reorganization of the pleadings. On the proofs before the referee, which furnish the only basis for the court's action, it is difficult to understand the line of reasoning which is supposed to lead to such a conclusion.

Passing the question of whether a trustee in bankruptcy should depart from his usual duties so far as would be necessary to enable him to execute such a trust, we are met at the outset with the question as to whether, at the time of adjudication, a trust of any kind, express or resulting, existed between the bankrupt and the stockholders in the Nebraska corporation. It was the possibility that a trust relation existed which influenced the stockholders to quitclaim their rights to Mr. Coffin, and to emphasize such action by consenting to a judgment, and to again cement it by permitting themselves to be forever enjoined from attacking the title, either while in the hands of Coffin, or his heirs or his grantees. It is not conceivable that the stockholders would have come into this condition if in June, 1902, there had been a suspicion that within a couple of years Mr. Coffin would have been forced into his present position. They gave faith and credit to him as a man of high character, and in this they were absolutely right; but they did more than that. Beyond his integrity, which is unquestioned and unquestionable, they relied upon his business ability and financial soundness. From no other point of view can we imagine them as consenting to a situation which gave other creditors an opportunity to satisfy their debts out of the western holdings. If Mr. Coffin had not been adjudicated a bankrupt, and no general creditor had attempted to satisfy his debt out of those holdings, and the stockholders had desired to make a change in the situation, we are not now concerned as to what the outcome might have been, or as to what course the stockholders ought to have pursued. A casual glance would lead one to think that it might have been necessary to go to the district court of Adams county, Neb., and there seek to be relieved from the yoke which they had permitted that court to place about their necks; but we will not pursue that thought. Since they have estopped themselves by deed and judgment from attacking Coffin's title when he should make a transfer, how can they hope to avoid a transfer made by operation of law from Coffin to his trustee in bankruptcy? He was adjudicated on his own petition, and therefore his voluntary act set in motion the machinery of the law, which of its

inherent force produced the transfer of title from him to his trustee. Such transfer, it is true, carries with it equities which had attached prior to adjudication, but it cannot carry an equity which the beneficiaries had of their own volition already relinquished.

Counsel for the beneficiaries admit that the trustee in bankruptcy is as well off, at least, as a sheriff would have been who might have held an execution based upon a creditor's judgment against Coffin prior to bankruptcy. The beneficiaries have placed themselves in such a position that they could not have assailed such an execution. The Congress has not made a law under which the property of A. can be taken to pay B.'s debt. The law says that a man's entire property shall be applied to the liquidation of his debts, and in the case before us the stockholders have no right to say that the title to the western real estate is not solely, entirely, and completely in the said Coffin. The truth is that the stockholders had such implicit confidence in Mr. Coffin that they both signed and confessed away all their rights, so that immediately after the decree they could not have compelled him to do the right thing had he been otherwise disposed. They voluntarily cut the cord which attached their equities to the property.

There is nothing else to discuss, except the claim made by the stockholders that Mr. Coffin recognized his trust relationship with them after the decree of June 2, 1902. The testimony shows that after June 2, 1902, Mr. Coffin did exactly what good conscience would lead any man to do. The property was absolutely his, and whenever he obtained any proceeds therefrom, after mingling them with his other funds—an indiscretion which perhaps ought to be pardoned—he kept strict account, and applied an equal amount for the purpose to which it was understood that such proceeds were to be applied. The beneficiaries understood this, and knew exactly what he was doing. This testimony seems to have been entirely irrelevant to the issues at hand. Mr. Coffin could not, if he would, have restored or recreated a trust relationship which had been put at rest by the decree. He and the stockholders acted under the decree and in obedience to it. Mr. Coffin's later actions would have been enough to give them power to compel him to act in their interest, if it can be imagined that he would have refused. Now the trustee in bankruptcy has the property. His position is not precisely the one which Mr. Coffin occupied prior to the adjudication. He represents general creditors, and the counsel have made an apt illustration when they suggest the attitude of a sheriff pressing an execution. Counsel say that it was not the intention of Mr. Coffin and the stockholders that the legal and equitable titles should merge in Mr. Coffin under the Adams county court decree, but rather that Mr. Coffin should hold both legal and equitable titles in trust for the stockholders. This amounts to saying that the proceedings in the district court of Adams county were intended as a subterfuge to mislead and misguide prospective purchasers of the western lands. That was not the intention of the parties. The acts of Mr. Coffin after the decree undoubtedly put the stockholders in a position where they could, if there had been time, have established such relation; but in that event the western property would have again

become clouded, so that a new decree or other device extinguishing the trust relationship would have been a necessity.

In closing it may be well to repeat that this decision simply confirms the orders of the referee, which it now seems that the petitioner who sought this review accepts.

The opinion has been prolonged for the purpose of indicating the attitude which the court will be apt to take whenever in its judgment the time shall be ripe therefor.